IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| DESTIN TRENT OVERSTREET, an individual, and ROES I-X,<br><br>Plaintiffs,<br><br><br>vs.<br><br><br>UNITED PARCEL SERVICE INC., an organization, and ROES I-X,<br><br>Defendants. | **ORDER AND MEMORANDUM DECISION GRANTING MOTION TO DISMISS**<br><br>Case No. 2:24-cv-00478-TC-DBP |

Before the court is Defendant United Parcel Service Inc. Ohio's (UPS) Motion to Dismiss (ECF No. 10) Plaintiff Destin Trent Overstreet's Complaint (ECF No. 1),[1] on which the court held oral argument on December 3, 2024.  For the following reasons, Mr. Overstreet's failure to accommodate claim is dismissed without prejudice, providing Mr. Overstreet leave to amend, while the remainder of Mr. Overstreet's claims are dismissed with prejudice.

---

[1] While Plaintiff's Complaint names the parent entity United Parcel Service Inc. as the Defendant in the case caption, Plaintiff served the Complaint on the subsidiary entity that employed Mr. Overstreet, the United Parcel Service Inc., Ohio, which waived service.  (Waiver of Service, ECF No. 7.)  Mr. Overstreet did not serve or receive a waiver of service from Defendant's publicly traded parent company, United Parcel Service Inc., Delaware.  Accordingly, where the court uses the term "Defendant" or "UPS," it is referring to United Parcel Service Inc., Ohio.

## BACKGROUND

### I.    FMCSR Regulation of Deaf Drivers

This case arises out of UPS's failure to grant its employee Mr. Overstreet's requests for an American Sign Language (ASL) interpreter at work and its decision to put Mr. Overstreet on temporary non-driving status in February 2023 while Mr. Overstreet experienced functionality issues with his hearing aids.

UPS is a global package delivery and logistics company.  (Compl. ¶ 30.)  Its drivers are responsible for delivering packages to customers in commercial vehicles regulated by the Department of Transportation (DOT) (id. ¶¶ 30, 45), consistent with the Federal Motor Carriers Safety Regulations (FMCSR).  49 C.F.R. §§ 300–99.  As an employer of commercial truck drivers, UPS must ensure that its drivers operate their vehicles in accordance with the FMCSR minimum safety rules, including by enforcing the FMCSR's physical qualifications for commercial drivers.  See 49 C.F.R. § 391.41(a)(1)(i).  But consistent with the FMCSR, employers can also, at their discretion, impose "more stringent requirements relating to safety of operation and employee safety and health" than the FMCSR's floor.  See 49 C.F.R. § 390.3(d).

Pursuant to 49 C.F.R. § 391.41(a)(1)(i), deaf employees driving for companies like UPS are ineligible to drive commercial vehicles without first obtaining a medical examiner's certificate, known as a "DOT Card."  (Compl. ¶ 31; see, e.g., Overstreet DOT Cards, ECF No. 19-1 at 4–5.)  To pass the required medical examination and obtain their DOT Card, applicants must pass the "forced whisper test," a minimal hearing requirement that deaf drivers can meet with the use of hearing aids.  See 49 C.F.R. § 391.41(b)(11).  The medical examiner-issued DOT Card will note any restrictions on the deaf individual's qualifications to operate a commercial vehicle, including if the individual is required by law to wear hearing aids to drive.  49 C.F.R. § 391.43(h); (e.g., ECF No. 19-1 at 4–5.)  Anyone who cannot satisfy the forced whisper test with

a hearing aid is ineligible to obtain a DOT card unless they apply for and receive a "hearing exemption" with the Federal Motor Carrier Safety Administration (FMCSA). See 49 U.S.C. § 31315(b)(1). To receive an exemption, individuals must submit an application with their driving history and a medical examiner certification indicating that a hearing exemption is required.[2] Before approving an exemption application, the FMCSA will publish a Federal Register notice requesting public comment on the application, with a 30-day comment period.[3] The FMCSA must consider and respond to all comments before making a final determination to grant or deny the exemption. See 49 U.S.C. § 31315(b). If an individual receives an FMCSA exemption from the forced whisper test, the doctor completing the DOT Card Medical Examiner's Certificate must check a box indicating that an exemption was issued. (E.g., ECF No. 19-1 at 4–5.)

From 2019 to 2024, UPS imposed more stringent employment qualifications for deaf drivers than the FMCSR floor—namely, UPS required all of its drivers to pass the forced whisper test, even if a deaf individual had received a hearing exemption under 49 U.S.C. § 31315(b)(1). (Compl. ¶ 54 n.6; ECF No. 10 at 6.) However, on September 5, 2023, UPS announced that starting in January 2024, it would begin accepting FMCSA exemptions for its small package delivery drivers. (Compl. ¶ 54.)

## II.    Mr. Overstreet's Employment at UPS

Mr. Overstreet is legally deaf and is bilingual in both English and American Sign Language (ASL). However, Mr. Overstreet can hear at a 40-decibel level with the help of his hearing aids. (Compl. ¶¶ 1, 49.) In September 2018, Mr. Overstreet joined UPS in Salt Lake City as a package loader/unloader. (Compl. ¶ 31.) In August 2019, Mr. Overstreet applied to

---

[2] FMCSA, Federal Hearing Exemption Application, https://www.fmcsa.dot.gov/medical/driver-medical-requirements/new-hearing-applicant-doc-email-version (last accessed Jan. 9, 2025).

[3] Id.

become a UPS driver and, as a necessary prerequisite, obtained a DOT Card on August 15, 2019, which authorized him to drive DOT regulated vehicles so long as he wore his hearing aids. (Compl. ¶ 31; ECF No. 19-1 at 4.)  Accordingly, Mr. Overstreet did not require an exemption, because with his hearing aids, he was able to pass the FMCSR forced whisper test.  Nonetheless, on October 14, 2021, Mr. Overstreet received a two-year exemption from the FMCSR hearing requirement, allowing him to operate a commercial motor vehicle in interstate commerce without his hearing aids through October 14, 2023.[4]  Mr. Overstreet did not, however, obtain a new DOT Card indicating that he had received an exemption from the requirement that he wear hearing aids while driving.  (ECF No. 19-1 at 4–5.)

In the year after he received his DOT Card, Mr. Overstreet passed a road driving test and UPS and Integrad classroom training, all largely without the use of an ASL interpreter.  (Id. ¶¶ 32–33.)  While Mr. Overstreet requested that UPS provide ASL interpreters at various points throughout his employment for driving tests as well as regularly scheduled driver meetings, UPS refused to consistently provide him an interpreter each time.  (Id. ¶ 38.)  Instead, for some but not all commercial driver meetings, UPS provided Mr. Overstreet with notes detailing what was said. (Id. ¶¶ 55, 57–58.)  Nonetheless, Mr. Overstreet successfully completed his training programs and certifications by relying on his hearing aids and was promoted to part-time driver in July 2020.  (Id. ¶¶ 32–33.)

On January 7, 2021, six months after he started as a driver for UPS, Mr. Overstreet was held at gunpoint while on the job.  (Id. ¶ 34.)  The gunman fled, and Mr. Overstreet called his manager, D'jon Taylors, who told Mr. Overstreet he could not stop working immediately because

---

[4] FMCSA. Notice of Final Disposition, available at: https://www.federalregister.gov/documents/2021/10/14/2021-22315/qualification-of-drivers-exemption-applications-hearing (last accessed Jan. 9, 2025).

they were "slammed," but that he should return to the UPS hub, "take a break," and wait to call the police.  (Id. ¶ 34.)  Mr. Overstreet, visibly upset, immediately returned to the UPS hub, where another UPS official told him to call the police and promptly "take a break."  (Id.)  Mr. Overstreet continued to work for UPS after this incident and was eventually promoted to full-time delivery driver status in April 2022.  (Id. ¶¶ 38–39.)

### III.    Mr. Overstreet is Placed on Non-Driving Status After Hearing Aid Issues

In January 2023, Mr. Overstreet complained to Amy Dillon, a center manager for UPS, that he was experiencing hearing loss or a loss of hearing aid functionality.  (Id. ¶ 49.)  At this point in time, Mr. Overstreet's FMCSA hearing exemption was still valid; however, it was not listed on Mr. Overstreet's DOT Card.  (ECF No. 19-1.)[5]  On January 5, 2023, Ms. Dillon reported Mr. Overstreet's complaint to the UPS Occupational Health nurse, who "advised Dillon to have [Mr.] Overstreet's hearing re-tested" and to place him in a non-driving status pending those results."  (Id. ¶¶ 49, 53.)  While he was on non-driving status, Mr. Overstreet worked in a UPS hub for roughly one month, during which he used paid vacation time for several days to meet with his audiologist and get his hearing tested.  (Id. ¶¶ 50–51.)  On January 13, 2023, after testing and adjusting the hearing aids, Mr. Overstreet's audiologist concluded that, with the newly functioning hearing aids, Mr. Overstreet again met the DOT standards.  (Id. ¶ 50.)  Mr. Overstreet provided a copy of his audiologist's report to UPS and returned to driving duties on February 6, 2023.  (Id.)

UPS required Mr. Overstreet to obtain a new DOT Card after his hearing aids malfunctioned, which Mr. Overstreet applied for and ultimately received on March 16, 2023.  (Id. ¶ 51.)  This new DOT Card, like his prior one, authorized Mr. Overstreet to drive DOT-

---

[5] From the face of the complaint, it is unclear if UPS was ever aware that Mr. Overstreet had received a hearing aid exemption from the FMCSA.

regulated vehicles only if he wore his hearing aids.  (Id. ¶ 50; ECF No. 19-1 at 4–5 (finding Mr.

Overstreet qualified to drive under the FMCSR "only when . . . wearing hearing aid").)  Mr.

Overstreet's new DOT Card, like his old one, did not indicate his receipt of the forced whisper

test exemption permitting him to drive commercial vehicles in interstate commerce without the

use of his hearing aids.  (ECF No. 19-1 at 4–5.)  Since returning from his temporary non-driving

status in February 2023, Mr. Overstreet has continued to drive for UPS.

## IV.    EEOC Charges

On April 3, 2023,[6] Mr. Overstreet filed an administrative charge of disability

discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC), 88

days after he had been put on non-driving status pending the results of his January 2023 hearing

tests.  (EEOC Charge, ECF No. 19-1 at 7–8.)  Mr. Overstreet's EEOC charge alleged that UPS

discriminated against him based on his disability by denying him ASL interpreters for his 2019

road test and 2020 driving class and for all monthly meetings beyond January 2022.  (Id.)  Mr.

Overstreet's charge also complained that, in 2021, UPS "denied" his hearing exemption, meaning

that Mr. Overstreet had to wear his hearing aids and was "force[d]" to both "talk and hear" in

English.  (Id.)  Finally, Mr. Overstreet alleged that from 2022 to 2023, UPS threatened to take

away his driving privileges and force him to renew his DOT Card if he complained about his

hearing loss or hearing aids, even though Mr. Overstreet's DOT Card was valid until 2025.  (Id.)

## V.    The Present Litigation

After receiving an EEOC notice of right to sue, Mr. Overstreet filed the present complaint

on July 1, 2024, alleging that UPS had violated the Americans with Disabilities Act (ADA) and

---

[6] While Mr. Overstreet  alleges that he filed his EEOC charge on September 10, 2023 (Compl. ¶
26), the EEOC charge on record, incorporated by reference in the Complaint, is dated April 3,
2023.  (E.g., ECF No. 19-1 at 8; ECF No. 10 at 5.)

Rehabilitation Act, discriminated against him because he primarily speaks American Sign Language (ASL), violated the first amendment, and negligently and/or intentionally caused him emotional distress by requiring that he return to work after he was held at gunpoint on the job.

On September 4, 2024, UPS filed a motion to dismiss on the basis that Mr. Overstreet had failed to state a claim on all six causes of action.  (ECF No. 10.)  The court's local rules require a response be filed within 28 days, no later than October 2, 2024.  DUCivR 7-1(a)(4)(A)(iii).  On September 8, 2024, Mr. Overstreet emailed UPS requesting an extension of indeterminate length. (Attorney Correspondence, ECF No. 19-2 at 4–5.)  UPS replied that it would consent to a reasonable extension and asked counsel how long an extension Mr. Overstreet was seeking.  (Id.) But Mr. Overstreet's counsel did not respond to UPS until October 12, 2024, ten days after the October 2, 2024 response deadline, asking UPS for an extension until October 19, 2024, citing personal issues.  (Id.)  UPS responded that it could not now agree to an extension because Mr. Overstreet had already missed the deadline.  (Id.)  Without filing any motion for extension, providing an excuse for the delay, or seeking to amend the Complaint, Mr. Overstreet filed his Opposition to UPS's Motion on November 3, 2024.  (ECF No. 17.)  On December 3, 2024, at the hearing on UPS's motion to dismiss, Mr. Overstreet moved for an extension, explaining that counsel had inadvertently failed to meet the deadline due to a personal conflict.  UPS conceded that it had not suffered any prejudice from the month-long delay.

## LEGAL STANDARD

"To survive a [Federal] Rule 12(b)(6) motion to dismiss, a plaintiff's complaint must allege sufficient facts 'to state a claim to relief that is plausible on its face.'"  Strauss v. Angie's List, Inc., 951 F.3d 1263, 1266 (10th Cir. 2020) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The court must "accept all well-pled factual allegations as true and view these

allegations in the light most favorable to the nonmoving party." Id. (citation omitted). "But that rule does not apply to legal conclusions." Tingey v. Midwest Off., Inc., No. 1:22-cv-145-TC, 2023 WL 8602841, at *2 (D. Utah Dec. 12, 2023) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009)). "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting Bell Atl. Corp., 550 U.S. at 555). When a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged[,]" a claim is facially plausible. Strauss, 951 F.3d at 1267 (citation omitted).

## ANALYSIS

### I.    Americans with Disabilities Act

Under the Americans With Disabilities Act of 1990 (ADA), "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring ... of employees ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The thrust of Mr. Overstreet's Complaint is that UPS violated the ADA and is therefore liable for both disability discrimination and failure to accommodate because it suspended Mr. Overstreet from his driving position while his hearing aids were malfunctioning and refused to provide Mr. Overstreet with ASL interpreters.[7] For the reasons discussed below, the court dismisses Overstreet's failure to accommodate claim without prejudice and his disability discrimination claim with prejudice.

---

[7] "[B]ecause the ADA defines discrimination in part as 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual,' a separate claim of discrimination can be stated under the ADA for failing to provide a reasonable accommodation." Davidson v. Am. Online, Inc., 337 F.3d 1179, 1188–89 (10th Cir. 2003) (citing 42 U.S.C. § 12112(b)(5)(A)).

### a. Failure to Accommodate

#### i. Administrative Exhaustion

The court first examines as a threshold matter whether Mr. Overstreet's failure to accommodate claim must be dismissed as time-barred.  Federal law requires that ADA failure to accommodate claims be administratively exhausted as a "prerequisite to suit."  See Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1181–85 (10th Cir. 2018) ("[E]xhaustion of administrative remedies is a "jurisdictional prerequisite to suit.").  To properly exhaust a claim under the ADA, employees subjected to disability discrimination face a statutory time limit:  They must file an EEOC charge of discrimination—including any failure to accommodate claim—within 300 days of any alleged discriminatory event.  See id. at 1182 (affirming dismissal because plaintiff "failed to exhaust his administrative remedies for" events that took place "more than 300 days before his lone EEOC charge").  Mr. Overstreet filed his EEOC charge on April 3, 2023, meaning his ADA claims must be, at least in part, tied to conduct occurring on or after June 7, 2022.

The court finds that the majority of Mr. Overstreet's allegations concerning UPS's refusal to provide an ASL interpreter refer to conduct before June 7, 2022.  (See Compl. ¶ 32 (alleging denial of ASL interpreter request for a 2019 road test), ¶ 33 (alleging denial of ASL interpreter request for a 2020 classroom training), ¶ 38 (alleging denial of ASL interpreter request for monthly meetings as of January 2022); ¶ 66 (alleging denial of ASL interpreter request for Mr. Overstreet's road test and 2020 classroom training).)  Those allegations therefore do not warrant relief.

At the court's hearing on UPS's motion, Mr. Overstreet argued for the first time that his allegations tied to UPS's conduct before June 7, 2022 remain actionable under the "continuing violations doctrine," which can "tether[] conduct from both inside and outside the limitations

period into one single violation that, taken as a whole, satisfies the applicable statute of limitations." Hamer v. City of Trinidad, 924 F.3d 1093, 1100 (10th Cir. 2019); e.g., Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002) (applying the continuing violation doctrine to claims for which EEOC administrative exhaustion is required). The court will not entertain argument inappropriately raised "for the first time at oral argument." United States v. Malone, 10 F.4th 1120, 1124–25 (10th Cir. 2021). Even so, Tenth Circuit law in the context of a Title II ADA claim (barring disability discrimination in state and local government services) suggests that UPS's denials of Mr. Overstreet's requests for ASL interpreters would not constitute a "continuing violation" of Title I of the ADA, but a "repeated violation" or "discrete act[] of discrimination," which "allows recovery for only that part of the injury the plaintiff suffered during the [300-day] period." Hamer v. City of Trinidad, 924 F.3d 1093, 1100–02 (10th Cir. 2019) (holding that city's repeated failure to fix sidewalks constituted discrete acts of discrimination, not a continuing violation); see also Bazemore v. Friday, 478 U.S. 385 (1986) (in a case considering discriminatory pay, each paycheck issued constituted a "separate wrong" with its own statutory clock); compare with Nat'l R.R. Passenger Corp., 536 U.S. at 115 (hostile work environment claims are "different in kind from discrete acts" and will generally constitute continuing violations because they are "based on the cumulative effects of individual acts"). Therefore, even if Mr. Overstreet's continuing violation argument had been properly raised in his Opposition, the doctrine would likely fail, as a matter of law, to save his time-barred claims.[8]

But Mr. Overstreet's failure to accommodate claim is not time-barred as a whole. Mr. Overstreet alleges that he was denied an ASL interpreter on a monthly basis from January 2022

---

[8] The court notes that, despite his failure to exhaust, Mr. Overstreet would not be barred from "using [UPS's] prior [discriminatory] acts as background evidence in support of [his] timely claim[s]." Nat'l R.R. Passenger Corp., 536 U.S. at 113.

onwards, despite regularly requesting interpreters for monthly meetings and trainings.  (Id. ¶¶ 38, 56–58.)  Accordingly, between June 7, 2022, and his April 3, 2023 EEOC charge, UPS denied Mr. Overstreet's request for an interpreter on multiple occasions, events that are specifically referenced in Mr. Overstreet's EEOC charge and thus administratively exhausted.  (See ECF No. 19-1 at 7 (alleging that after January 2022, UPS stopped providing ASL interpreters on a monthly basis)); see, e.g., Howard v. United Parcel Serv., Inc., 101 F. Supp. 3d 343, 353 (S.D.N.Y. 2015) (dismissing reasonable accommodation claim as time-barred insofar as it was based on UPS's decision not to provide ASL interpreter for meeting more than 300 days before EEOC charge, but finding claim not time-barred for incidents that occurred within 300 days of the EEOC charge), aff'd, 648 F. App'x 38 (2d Cir. 2016).

In sum, Mr. Overstreet adequately exhausted numerous instances of alleged disability discrimination in the statutory period, meaning those specific allegations are actionable, while the remainder, which he failed to exhaust, are not.

## ii.  Reasonable Accommodation

The court next examines whether Mr. Overstreet adequately states a failure to accommodate claim based on the Complaint's remaining administratively exhausted allegations—UPS's refusal to provide ASL interpreters in monthly meetings and trainings from June 7, 2022, through April 3, 2023.  To adequately plead a failure to accommodate claim, Mr. Overstreet must show that (1) he is disabled within the meaning of the ADA; (2) he is "otherwise qualified" to perform the essential functions of the job with reasonable accommodations; and (3) he "requested a plausibly reasonable accommodation." Herrmann v. Salt Lake City Corp., 21 F.4th 666, 674 (10th Cir. 2021) (citing Punt v. Kelly Servs., 862 F.3d 1040, 1050 (10th Cir.

2017)); see also Exby-Stolley v. Bd. of Cnty. Comm'rs., 979 F.3d 784, 792 (10th Cir. 2020).[9]  A reasonable accommodation includes "modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability" to perform the essential functions of that position" or "to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities."  29 C.F.R. § 1630.2; see also Dansie v. Union Pac. R.R. Co., 42 F.4th 1184, 1193 (10th Cir. 2022) ("'[R]easonable accommodation' means those accommodations which presently, or in the near future, enable the employee to perform the essential functions of his job.").  The court finds that Mr. Overstreet fails to state a failure to accommodate claim on the facts alleged because the ADA does not require that employers like UPS provide accommodations unless doing so is necessary for the employee's job performance and participation.

Mr. Overstreet claims that he was entitled to his requested accommodation simply because "ASL interpreters are auxiliary aids and services that a covered entity must provide to their employees when requested or offered to the employee."  (ECF No. 17 at 3.)  Under this logic, any employee, regardless of need, would be entitled to accommodation upon request.  But Mr. Overstreet's argument overlooks the ADA's driving purpose: the statute was intended to protect individuals who need an accommodation so that people with disabilities can enjoy equal benefits and privileges of employment and civic life.  Accepting the Complaint's allegations as true, the court finds that Mr. Overstreet had equal access to the privileges of employment at UPS so long as he was wearing his hearing aids.  With his hearing aids, Mr. Overstreet concedes that

---

[9] UPS does not dispute that Mr. Overstreet is disabled, that he is qualified to perform the job's essential functions when he is wearing his hearing aids, or that Mr. Overstreet requested an accommodation by virtue of requesting ASL interpreters.

he is able to hear fully "within the DOT standard." (Compl. ¶ 50.)  Indeed, he drove and passed all of UPS's training requirements, and was even promoted to a driver position without an ASL interpreter. (Id. ¶¶ 32–33.)  While he had technical issues for a short time, his hearing aids were promptly adjusted by his audiologist, providing full functionality.  Nowhere does the Complaint allege that Mr. Overstreet could not hear and understand team meetings when he was wearing his hearing aids.  In fact, Mr. Overstreet's EEOC charge alleges that UPS "force[d] [him] to talk and hear" his coworkers, implying that he is able to do so.  (ECF 19-1 at 7–8.)  On the facts alleged, the court must infer that, despite his disability, Mr. Overstreet did not need an accommodation, let alone his requested one, because he could enjoy the benefits and privileges of employment equal to those without hearing loss by relying on his hearing aids.  E.g., Howard v. City of Sedalia, Missouri, 103 F.4th 536, 541–42 (8th Cir. 2024) (reversing district court's denial of judgment as a matter of law because plaintiff had failed to identify any employer-sponsored benefit or program to which she lacked access without an accommodation); Nichols v. Unison Indus., Inc., 2001 WL 849528, at *6 (N.D. Ill. July 24, 2001) (granting summary judgment because employee did not need requested accommodation to perform the job); Gaines v. Runyon, 107 F.3d 1171, 1175 (6th Cir. 1997) (requiring that the accommodation be both reasonable and necessary for the plaintiff to perform the essential functions of his job).

Nonetheless, based on Mr. Overstreet's argument at the December 3, 2024 hearing, the court recognizes that Mr. Overstreet can likely adequately plead, upon minimally amending his Complaint, that he required a reasonable accommodation for the purpose of receiving information shared at UPS's driver meetings and training sessions.  At the hearing, Mr. Overstreet's counsel explained that a deaf individual's ability to hear sufficiently to drive under the DOT commercial driver requirements (40 decibels) is different from his ability to adequately

hear and understand conversations.  Under Fed. R. Civ. P. 15(a), the grant of an opportunity to amend the complaint is within the discretion of the court, even where, as here, a plaintiff has not moved to amend.  The court finds good cause for amendment, given that this would be Mr. Overstreet's first amendment, and doing so is likely to cure the pleading deficiency on his failure to accommodate claim.

UPS argues that regardless of Mr. Overstreet's need for an accommodation, it did not act unreasonably by refusing Mr. Overstreet an ASL interpreter because employers are not obligated to provide the accommodation of an employee's choice if other accommodations are available. (ECF No. 10 at 19 ("[T]he ADA only requires UPS to provide Overstreet a reasonable accommodation, not the accommodation he prefers").)  The court agrees that alternative accommodations might allow Mr. Overstreet to take part in these at-issue meetings, including, for example, if UPS provided written transcriptions or summaries of meetings—a remedial measure that UPS did provide on some occasions.  (Compl. ¶ 57.)  But on the facts alleged, the court can infer that the meeting notes UPS provided were not a sufficient accommodation for Mr. Overstreet's disability because the notes were incomplete, covering some but not all meetings, and, in some instances, including only "brief comments."  (Id.)  Most critically, it does not appear that UPS ever included Mr. Overstreet in an interactive process to find a workable and adequate accommodation, interpreter or otherwise, as it is required to do under the ADA.  See Smith v. Midland Brake, Inc., 180 F.3d 1154, 1172 n.10 (10th Cir. 1999) (recognizing that employer's engagement with disabled employee is typically "an essential component of the

[ADA's] statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee").

Accordingly, assuming that Mr. Overstreet can amend his Complaint to include plausible allegations that he needed an accommodation to take part in UPS's meetings, he might be able to state a failure to accommodate claim. The court therefore dismisses Mr. Overstreet's failure to accommodate claim without prejudice, providing Mr. Overstreet leave to add allegations surrounding his inability to hear in meetings despite the use of his hearing aids.

### b. Disability Discrimination

To establish a prima facie case of disability discrimination related to UPS's January 2023 decision to put Mr. Overstreet on temporary non-driving status, Mr. Overstreet must plead facts sufficient to support a plausible inference (1) that he is disabled pursuant to the ADA; (2) that he was, at that time, qualified for the job; and (3) his employer took adverse action against him on the basis of his disability.[10] See, e.g., Kilcrease v. Domenico Transp. Co., 828 F.3d 1214, 1218–19 (10th Cir. 2016); Couture v. Belle Bonfils Mem'l Blood Ctr., 151 F. App'x 685, 689 (10th Cir. 2005). The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); see also Tate v. Farmland Indus., Inc., 268 F.3d 989, 993 (10th Cir. 2001). The court finds that Mr. Overstreet was not qualified to perform the essential functions of a commercial vehicle driver without functioning hearing aids—in other words, UPS did not violate the ADA when it put him on non-driving status

---

[10] The parties do not dispute that Mr. Overstreet is disabled because he is deaf. Even so, the Supreme Court has articulated that courts must conduct a case-by-case analysis when evaluating whether an impairment that can be mitigated with artificial auxiliary aids is a disability. See Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 565 (1999).

because UPS was simply enforcing the FMCSR, as it is legally obligated to do.  Mr. Overstreet's

disability discrimination claim is dismissed with prejudice.

### i.  Qualifying to Drive Without Functioning Hearing Aids

Mr. Overstreet concedes that his hearing aids were not functioning when he was placed

on leave, but argues that he was still qualified to drive because federal law mandates only that

drivers wear hearing aids, and "does not specify that those hearing aids must be in working

order."  (ECF No. 17 at 17 (citing 49 C.F.R. § 391.43(h)).)  He therefore concludes that UPS's

functioning hearing aid requirement is based on the "discriminatory belief that Deaf people

cannot drive."  (Id.)  The court rejects Mr. Overstreet's argument because it rests on a flawed

reading of 49 C.F.R. § 391.43(h).  Further, Mr. Overstreet cannot, through his case against UPS,

challenge the soundness of the FMCSA and DOT's regulations.

By the plain terms of Mr. Overstreet's DOT Card, consistent with 49 C.F.R. § 391.43(h),

he was required to wear a "hearing aid" when driving.  A device that that does not actually

mitigate hearing loss by amplifying sounds can hardly qualify as an "aid."  This conclusion is

consistent with the plain text of 49 C.F.R. § 391.41, setting the physical qualifications for drivers,

by which a person is only "physically qualified to drive a commercial motor vehicle if that

person . . . by use of an audiometric device, does not have an average hearing loss . . . greater

than 40 decibels at 500 Hz . . . when the audiometric device is calibrated" to national standards.

Accordingly, by the regulation's plain text, the FMCSR requires that commercial vehicle drivers

wear <u>functioning</u> hearing aids—ones that are property calibrated and which actively reduce

hearing loss.  UPS therefore did not "discriminate" within the meaning of the ADA when it

logically concluded that Mr. Overstreet—without functioning hearings aid and having failed to

present a DOT Card indicating he had received an FMCSA hearing aid exemption—failed to

meet the DOT commercial driver standards.

16

In addition to contradicting the plain meaning of 49 C.F.R. § 391.43's physical qualifications for drivers, Mr. Overstreet's interpretation of the hearing aid requirement is inconsistent with the legislature's intent in passing the FMCSR.  See God's Storehouse Topeka Church v. United States, 98 F.4th 990, 995 (10th Cir. 2024) ("As in all cases of statutory construction, this court's 'foremost duty is to ascertain the congressional intent and give effect to the legislative will.'" (citing Ribas v. Mukasey, 545 F.3d 922, 929 (10th Cir. 2008)).  Mr. Overstreet has not, presumably because he cannot, articulate any reason for why the DOT and FMCSA would promulgate a safety regulation that permits drivers with hearing loss to mitigate the safety issue by wearing non-functioning hearing aids.  How could such a result possibly benefit public safety?  Indeed, under this logic, drivers could flaunt other widely enforced safety regulations with seatbelts that do not click into receptors or airbags that do not inflate.  Surely such results, like the outcome Mr. Overstreet urges here, are plainly at odds with the remedial purposes underlying these driver safety requirements.

While Mr. Overstreet cites to studies that hearing-impaired drivers pose no real safety threat (ECF No. 17 at 17–19), the legislature and DOT have concluded otherwise by requiring hearing aids of commercial drivers, like Mr. Overstreet, absent an exemption—which Mr. Overstreet did not have featured on either of his DOT Cards.  Both the Supreme Court and Tenth Circuit have upheld hearing aid regulations as binding and acknowledged that they remain unchallenged because the rules align with the federal government goal of promoting public safety.  E.g., Albertson's, Inc., 527 U.S. at 570; Hawkins v. Schwan's Home Serv., Inc., 778 F.3d 877, 895 (10th Cir. 2015).  This case, brought under the ADA and not involving the DOT as a party, is an "inappropriate device for challenging" the FMCSR's purpose or logic.  E.g., Samson v. Fed. Exp. Corp., 874 F. Supp. 2d 1360, 1372 (M.D. Fla. 2012), rev'd and remanded on other

grounds, 746 F.3d 1196 (11th Cir. 2014).  If Mr. Overstreet wanted UPS to provide him an exemption from the commercial driver hearing aid requirement, then his DOT Card needed to feature an FMCSA exemption.

The Supreme Court has described the relationship between the DOT's physical qualifications for commercial drivers and the elements of an ADA claim and explained that the ADA's protections, while broad, are nonetheless limited in scope by safety rules, like the DOT's, stating:

> When Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law.  The Senate Labor and Human Resources Committee Report on the ADA stated that "a person with a disability applying for or currently holding a job subject to [DOT standards for drivers] must be able to satisfy these physical qualification standards in order to be considered a qualified individual with a disability" under [the ADA].

Albertson's, 527 U.S. at 573.  In sum, an ADA claim, like Mr. Overstreet's, that seeks an outcome inconsistent with DOT standards cannot survive dismissal.

### ii.  UPS's Deaf Driver Policies

Mr. Overstreet's complaint separately alleges that UPS's employment policies from 2019 to 2024, in which UPS refused to honor FMCSA whisper test exemptions, also constitute disability discrimination.  (See Compl. ¶ 82 ("Defendant engaged in discriminatory policies, practices, and procedures against the Plaintiff . . . refus[ing] to accept Mr. Overstreet's hearing exemption and forc[ing] him to get a hearing test even though his current hearing waivers had not yet expired.").)  There is no dispute that, during this period, UPS's standards for deaf drivers extended beyond the minimum standards imposed by the FMCSA.  That is legally permissible "so long as [those] standards are job-related and consistent with business necessity, and performance cannot be accomplished by reasonable accommodation."  Albertson's, Inc., 527 U.S. at 568 (cleaned up) (citing § 12113(a) and § 12112(b)(6) (defining discrimination to include

18

"using qualification standards . . . that screen out or tend to screen out an individual with a disability . . . unless the standard . . . is shown to be job-related for the position in question and is consistent with business necessity.")).  But the court need not here address whether UPS's employment qualifications policy for deaf drivers was "job-related and consistent with business necessity" because the Complaint shows that Mr. Overstreet's DOT Card did not indicate that he could drive a commercial vehicle without working hearing aids—in other words, Mr. Overstreet was barred from driving under UPS's adherence to the FMCSR, which required functioning hearing aids, and not any potentially discriminatory, UPS-specific rule barring the employment of deaf drivers who received DOT-issued exemptions from the forced whisper test.  Because UPS has an unconditional obligation to follow the FMCSR, its right to do so cannot be questioned.  See Albertson's, Inc., 527 U.S. at 570 (finding the validity of the FMCSA regulations are "unchallenged, they have the force of law, and they contain no qualifying language about individualized determinations.")

## II.    Rehabilitation Act

The Rehabilitation Act requires that qualified individuals with disabilities be provided meaningful access to programs or activities receiving federal funds.  Mr. Overstreet claims that he is entitled to damages under Section 504 of the Rehabilitation Act based on the same conduct underlying his disability discrimination and failure to accommodate claims arising under the ADA.  "Although the same substantive standards apply under the Rehabilitation Act and the ADA, the applicability of the Rehabilitation Act is significant because it, unlike the ADA, does not require the exhaustion of administrative remedies."  Edmonds-Radford v. Sw. Airlines Co., 17 F.4th 975, 986 (10th Cir. 2021) (citing Nielsen v. Moroni Feed Co., 162 F.3d 604, 608 n.7 (10th Cir. 1998)).  Allegations that Mr. Overstreet failed to administratively exhaust (i.e., the

additional instances where UPS denied Mr. Overstreet an accommodation from 2018 until June 2022) may be considered if his claims arising under the Rehabilitation Act survive dismissal.

To establish a prima facie case of either disability discrimination or failure to accommodate under the Rehabilitation Act against a private employer like UPS, Mr. Overstreet must fulfill the same pleading requirements required of claims brought under the ADA, but must also plausibly allege that "the program receives federal financial assistance." McGeshick v. Principi, 357 F.3d 1146, 1150 (10th Cir. 2004); see also Wilkerson v. Shinseki, 606 F.3d 1256, 1262 (10th Cir. 2010); DeVargas v. Mason & Hanger-Silas Mason Co., 911 F.2d 1377, 1382 (10th Cir. 1990).

### a. Federal Financial Assistance

Because the court grants Mr. Overstreet leave to amend his complaint to bolster his failure to accommodate claim, the court must also consider whether UPS's employment of Mr. Overstreet and alleged failure to accommodate, if bolstered by additional allegations regarding his inability to hear in meetings, is governed by the Rehabilitation Act, which, in turn, requires the court to determine whether the complaint and public record contain facts sufficient to demonstrate that UPS "receive[d] federal financial assistance." Wilkerson, 606 F.3d at 1262.

As an initial matter, the court must consider evidence outside the Complaint to evaluate whether UPS received "federal financial assistance." Here, both parties have submitted reliable materials for the court to consider on this issue: UPS submits its publicly available SEC Form 10-K, while both parties rely on data pulled from the Federal Reserve Reports to Congress. (SEC Form 10-K, ECF No. 19-3; ECF No. 17 at 20 n.21.) "[I]n general, a motion to dismiss should be converted to a summary judgment motion if a party submits, and the district court considers, materials outside the pleadings." Prager v. LaFaver, 180 F.3d 1185, 1188 (10th Cir. 1999). Nonetheless, the court can take judicial notice of the materials the parties have submitted

here in briefing the instant motion, as well as the Federal and New York Reserves' descriptions of the at-issue government programs, without converting this motion to dismiss to one for summary judgment because these materials, available on government websites, are matters of public record from undisputedly reliable sources.  See, e.g., United States v. Iverson, 818 F.3d 1015, 1022 (10th Cir. 2016) (finding information provided on FDIC website is matter of public record); Stewart v. Stoller, No. 2:07-cv-552-DB-EJF, 2014 WL 1248072, at *1 (D. Utah Mar. 25, 2014) ("[C]ourts often take judicial notice of public records available on the Internet"); Rollins v. Dignity Health, 338 F. Supp. 3d 1025, 1032 (N.D. Cal. 2018) ("A government agency's records will often be judicially noticeable because they are public records.").

Taking this publicly available information into consideration, the court examines whether UPS received "federal financial assistance," a term undefined by the Rehabilitation Act.  The Tenth Circuit explains that a non-governmental company, like UPS, receives "federal financial assistance," thereby triggering the Rehabilitation Act, if it receives a government "subsidy." DeVargas, 911 F.2d at 1382.  In DeVargas, the Tenth Circuit reasoned that where the government pays a company for a good or service, its payment of funds must be categorized as "compensation," rather than an unconditional "subsidy."  Id.  This analysis dictates the court's conclusion here: that UPS did not receive "federal assistance" and is therefore not subject to the Rehabilitation Act.

Mr. Overstreet initially contended that UPS "receive[d] federal financial assistance" by accepting government "COVID-19 grants" during the pandemic to "keep their business operations going."  (Compl. ¶¶ 79, 92, 137).  In opposing dismissal, Mr. Overstreet more specifically cites public records that UPS received six "subsidized loans" from the federal government under the Coronavirus Aid, Relief, and Economic Security (CARES) Act and/or the

American Rescue Plan Act.[11]  These programs are detailed on the Federal Reserve and New York Federal Reserve websites, which the court summarizes below.

Following the economic effects of the pandemic on financial markets, the Federal Reserve took action to avoid additional disruption to the corporate bond market.  From August through November of 2020, the federal government provided funds to a special purpose vehicle (SPV) established by the Federal Reserve through an initiative called the Secondary Market Corporate Credit Facility (SMCCF).[12]  Accordingly, from June through December 2020, the Federal Reserve's SPV, managed by the Federal Reserve Bank of New York (FRBNY), used federal government funds to acquire corporate bonds in investment-grade publicly traded companies, including UPS (Delaware).[13]  (ECF No. 19 at 4; ECF No. 17 at 20.)  Effectively, the SPV's bond-buying supplied companies, like UPS, with credit at a time when it was otherwise hard to come by.  But public records demonstrate that this was not "free money."  Through these purchases, the SMCCF, and thereby the Federal Reserve, received a benefit too—a corporate bond—meaning these payments were not, like the Paycheck Protection Program, forgiveable loans or gifts,[14] but rather investments through which the government could realize a profit.

---

[11] The court does not regard the detail provided in Mr. Overstreet's Opposition as a "new allegation."  Compare with Brundy v. Schreiber Foods, Inc., No. 1:19-cv-60-CW, 2023 WL 8481381, at *7 (D. Utah Dec. 7, 2023) (explaining that, without formal motion for leave to amend, new allegations raised in opposition memorandum will be disregarded in evaluating a motion to dismiss).

[12] See Secondary Market Corporate Credit Facility, Board of Governors of the Federal Reserve System, https://www.federalreserve.gov/monetarypolicy/smccf.htm (last accessed Jan. 9, 2025).

[13] See FRBNY Frequently Asked Questions on the Secondary Market Corporate Credit Facility, https://www.newyorkfed.org/markets/primary-and-secondary-market-faq/corporate-credit-facility-faq (last accessed Jan. 9, 2025).

[14] By contrast, District Courts are split on whether Payment Protection Program (PPP) loans issued during the pandemic, which can be forgiven, constitute federal financial assistance.  See, e.g., Doe v. Abington Friends Sch., 2022 WL 16722322, at *7 (E.D. Pa. Nov. 4, 2022) ("[A] program [that] received a PPP loan [is] sufficient to establish receipt of federal financial

Indeed, starting in June 2021, the SMCCF began to gradually sell its corporate bond holdings at prevailing market prices.[15]  On these facts, the court concludes that UPS and the federal government were participating in a market exchange of goods for consideration, as opposed to a government subsidy program.[16]  UPS is not governed by the Rehabilitation Act because it did not receive "federal financial assistance."  Mr. Overstreet's Rehabilitation Act claim is therefore dismissed with prejudice.

### b. Disability Discrimination and Failure to Accommodate Under the Rehabilitation Act

Alternatively, "because [Mr. Overstreet's] Rehabilitation Act claim is derivative of [his] ADA claims, it necessarily fails" for the same reasons that his ADA claims fail.  Hennagir v. Utah Dep't of Corr., 587 F.3d 1255, 1267 (10th Cir. 2009) (citing Jarvis v. Potter, 500 F.3d 1113, 1121, 1125 (10th Cir. 2007) (concluding that the standards for discrimination and retaliation claims under the Rehabilitation Act are the same as those for discrimination and retaliation claims under the ADA)).  As discussed above, Mr. Overstreet has not adequately pled disability discrimination under the ADA by virtue of UPS's enforcement of FMCSA/DOT regulations, nor was he "otherwise qualified" to drive while his hearing aids were malfunctioning.

---

assistance for the purpose of surviving a motion to dismiss" on a Rehabilitation Act claim); Husbands v. Fin. Mgmt. Solutions, LLC, 2021 WL 4339436, at *8 (D. Md. Sept. 23, 2021) (finding allegations that a defendant was the recipient of PPP loans sufficient to state a claim for relief under the Rehabilitation Act).

[15] See Federal Reserve, June 2, 2021 Press Release, https://www.federalreserve.gov/newsevents/ pressreleases/monetary20210602a.htm (last visited January 9, 2025).

[16] Because the court finds that UPS did not receive a "subsidy" and is therefore not governed by the Rehabilitation Act, the court will not delve into UPS's alternative basis for dismissing this claim—namely, that the UPS entity who received the alleged "federal assistance" was the parent company UPS (Delaware), as opposed to UPS (Ohio), the Defendant here.  (ECF No. 19 at 4.)

### III.    Language Discrimination

Mr. Overstreet's third and fourth causes of action allege that UPS is liable for "language discrimination" because it denied his request for an ASL interpreter in violation of Title VI and Title VII of the Civil Rights Act of 1964.[17]  (Compl. ¶¶ 90–122.)  UPS moved to dismiss these claims on the grounds that Mr. Overstreet failed to state a claim under either Title VI or Title VII because he is not a member of a "protected class."  Mr. Overstreet did not oppose this basis for dismissal in his Opposition, and at the hearing on December 3, 2024, orally stipulated to dismiss these claims.  The court dismisses claims three and four with prejudice.

### IV.    First Amendment

Mr. Overstreet's fifth claim accuses UPS of violating the First Amendment's free speech protections by refusing to provide him with ASL interpreters for his road test, various meetings, and his 2020 classroom training.  (Compl. ¶¶ 123–39.)  The court dismisses Mr. Overstreet's claim with prejudice because the First Amendment applies to acts of governmental entities or actors, not private corporations.  See Manhattan Cmty. Access Corp. v. Halleck, 587 U.S. 802, 809 (2019) (finding corporations are not state actors subject to First Amendment constraints); VDARE Found. v. City of Colorado Springs, 11 F.4th 1151, 1168 (10th Cir. 2021) (affirming Rule 12(b)(6) dismissal of First Amendment claim that failed to allege state action); How v. City of Baxter Springs, 217 F. App'x 787, 792 n.3 (10th Cir. 2007) (noting that First Amendment claims require allegations of state action) (citing Hudgens v. NLRB, 424 U.S. 507, 513, (1976) ("It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state.")); Ravines de Schur v. Dahlqvist, No.

---

[17] Title VI prohibits exclusion from participation in or benefits from programs and activities that receive federal financial assistance in such programs.  42 U.S.C. § 2000d.  Title VII prohibits employment discrimination.  42 U.S.C. § 2000e-2(a).

2:22-cv-54-DB-DAO, 2022 WL 1294966, at *3 (D. Utah Apr. 7, 2022) (plaintiff's first amendment claim against private, non-state actor fails to state a plausible claim for relief), report and recommendation adopted, 2022 WL 1288855 (D. Utah Apr. 29, 2022), appeal dismissed, 2022 WL 16579596 (10th Cir. June 9, 2022).

Companies like UPS may be classified as "state actors" constrained by First Amendment free speech protections "(i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." Manhattan Cmty. Access Corp. v. Halleck, 587 U.S. 802, 809 (2019) (cleaned up). But Mr. Overstreet did not—in either his Complaint or in opposing dismissal of this claim—provide the court with any reasonable basis to conclude that UPS meets these standards. There are no allegations suggesting, nor can the court reasonably infer on its own, that the United States compelled—or acted jointly with—UPS to refuse Mr. Overstreet's requests for ASL interpreters. Nor does UPS, in employing drivers to deliver packages, conduct business or exercise powers traditionally designated exclusively to the government, as many federal courts examining similar constitutional claims have concluded. E.g., Johnson v. United Parcel Serv., Inc., 2023 WL 11796096 (N.D. Ga. Dec. 19, 2023) (finding UPS was a private party, not a governmental actor, under Bivens test); Mitchell v. United Parcel Serv., 21 F. Supp. 2d 627, 629 (S.D. Miss. 1998) ("UPS is a private company who does not exercise a state right or privilege in its delivery of parcels [given that] UPS is not affiliated with any state or governmental entity, and no state government entity is responsible for its actions."); Phillips v. United Parcel Serv., 2011 WL 2680725, at *10 (N.D. Tex. June 21, 2011) (granting motion to dismiss Fourteenth Amendment claim because complaint contained no allegations that UPS was acting in any capacity other than as a private corporation), report and recommendation

adopted, 2011 WL 2678949 (N.D. Tex. July 8, 2011), aff'd, 485 F. App'x 676 (5th Cir. 2012);

United States v. Washington, 2018 WL 493028, at *15 (D. Nev. Jan. 5, 2018) (declining to

suppress evidence under Fourth Amendment because UPS employee searching package for

marijuana pursuant to UPS policy was not acting as a "government instrument or agent," but as a

private citizen), report and recommendation adopted, 2018 WL 988949 (D. Nev. Feb. 20, 2018);

United States v. Harris, 2021 WL 4555836, at *13 (S.D. Fla. Aug. 25, 2021) (same in a case

involving FedEx), report and recommendation adopted, 2021 WL 4554655 (S.D. Fla. Oct. 5,

2021), aff'd, 2023 WL 6313559 (11th Cir. Sept. 28, 2023).  Nor has Mr. Overstreet identified any

caselaw in support of his allegation that UPS is subject to the First Amendment because it

received "COVID-19 grants" or "other sources of funding from the federal government to keep

their business operations going" during the pandemic.  (Compl. ¶ 137.)  Indeed, First

Amendment law dictates otherwise.  See Manhattan Cmty. Access Corp. v. Halleck, 587 U.S.

802, 814 (2019) (holding that government funding or subsidization of a private entity "does not

convert the private entity into a state actor—unless the private entity is performing a traditional,

exclusive public function").

## V.    Negligent And Intentional Infliction of Emotional Distress

Mr. Overstreet's Sixth and Seventh claims allege that D'jon Taylors' direction that Mr.

Overstreet return to the UPS hub after being held at gunpoint—prior to his taking a break or

calling the police—was intolerable and/or outrageous, therefore amounting to intentional

infliction of emotional distress (IIED) or negligent infliction of emotional distress (NIED).

(Compl. ¶¶ 140–54.)  UPS moves to dismiss Mr. Overstreet's NIED and IIED claims as barred

by the "exclusive remedy" provision of the Utah Workers' Compensation Act (UWCA) and otherwise insufficient to meet Tenth Circuit pleading standards.  The court agrees.

### a. The UWCA "Exclusive Remedy" Provision

The UWCA offers workers a "simple, adequate, and speedy" forum for remedying certain workplace injuries while also "protecting employers from 'disruptive or vexatious lawsuits' for alleged negligence."  Jensen v. Nucor Corp., No. 1:21-cv-100-DAK-JCB, 2021 WL 4748453, at *1 (D. Utah Oct. 12, 2021) (citing Helf v. Chevron U.S.A., Inc., 203 P.3d 962, 967 (Sup. Ct. Utah 2009)).  It is the "exclusive remedy against the employer . . . for any accident or injury or death, in any way contracted, sustained, aggravated, or incurred by the employee in the course of or because of or arising out of the employee's employment."  Utah Code Ann. § 34A-2-105(a). The UWCA broadly bars tort claims for emotional distress unless an employee's injury was intentional.  See Crowe v. SRR Partners, LLC, No. 4:21-cv-108-TS-PK, 632 F. Supp. 3d 1233, 1242 (D. Utah 2022) ("The exclusive remedy provision includes both physical and mental injuries."); Christiansen v. Harrison W. Constr. Corp., 500 P.3d 825, 830 (Sup. Ct. Utah 2021) ("Under the Act, employees are barred from suing their employers for injuries stemming from workplace accidents—except where the employer intended the harm" or where the court can reasonably infer from the pleading that the "employer was 'virtually certain' that the employee's injury would occur").  Mr. Overstreet did not respond to UPS's argument to oppose dismissal of his NIED and IIED claims on this basis.  In any event, the court agrees with UPS that these claims relate to mental harm arising from actions that occurred in the workplace and are therefore preempted by the UWCA.  The court dismisses Mr. Overstreet's NIED claim.

The court next examines whether Mr. Overstreet can overcome UWCA preemption with an IIED claim under the "intentional injury exception," Christiansen, 500 P.3d 825 at 832, a "high bar."  Crowe, 632 F. Supp. at 1241.  An employee can successfully invoke the intentional-

injury exception at the pleading stage by alleging "that the actor desired the consequences of his [or her] actions." Christiansen, 500 P.3d 825 at 832.  Alternatively, the employee can allege, by pleading facts suggesting that the employer believed the employee's injury was "virtually certain to result," meaning that the employer "knew or expected that injury would occur as a consequence of his [or her] actions." Id.

The court finds that Mr. Overstreet's allegations are insufficient to overcome the UWCA intentional-injury exception and therefore dismisses his IIED claim.  Mr. Overstreet does not provide any factual allegations showing that his manager intended to traumatize him further when he asked Mr. Overstreet to continue working.  Indeed, Mr. Overstreet concedes that UPS had a business reason for asking him to return to the hub right away—his team was "slammed with work and didn't have any drivers to assist him."  (Compl. ¶ 34.)  That is not ill-will.  Moreover, the facts alleged demonstrate that UPS held some level of concern for Mr. Overstreet's mental health and attempted to avoid—rather than exacerbate—trauma beyond that which Mr. Overstreet experienced at the hands of the gunman.   Once Mr. Overstreet returned to the hub, he was told that he could "immediately call the police and take a break."  (Id.)  The court cannot reasonably conclude that anyone at UPS intended, knew, or reasonably believed that Mr. Overstreet would experience additional emotional distress by delaying his break or police report.

### b.  Stating A Claim for Intentional Infliction of Emotional Distress

The court also dismisses Mr. Overstreet's IIED cause of action for failing to state a claim. IIED claims must plead fact sufficient to show the following:

> (1) The defendant intentionally engaged in some conduct toward the plaintiff considered outrageous in that it offends the generally accepted standards of decency and morality (2) with the purpose of inflicting emotional distress or where any reasonable person would have known such result, and (3) such emotional distress resulted.

28

Tingey v. Midwest Off., Inc., No. 1:22-cv-145-TC, 2023 WL 8602841, at *4 (D. Utah Dec. 12, 2023) (citing Matthews v. Kennecott Utah Copper Corp., No. 2:97-cv-549-DB, 54 F. Supp. 2d 1067, 1075 (D. Utah 1999)); see also Hogan v. Winder, 762 F.3d 1096, 1111 (10th Cir. 2014). Asking Mr. Overstreet to return to the UPS hub prior to taking a break or calling the police may be described as unreasonable, unkind, or unfair, but no reasonable person would conclude it amounts to "outrageous," vile, or repulsive conduct.  Compare Cabaness v. Thomas, 232 P.3d 486, 499 (denying summary judgment where a lengthy pattern of insults, profanity, and targeted safety violations at work could be considered outrageous and intolerable), abrogated on other grounds by Gregory & Swapp, PLLC v. Kranendonk, 424 P.3d 897 (Sup. Ct. Utah 2018), with Retherford v. AT & T Communications, 844 P.2d 949, 975–76, 978 (Sup. Ct. Utah 1992) (holding that a single indignity may not amount to outrageous conduct sufficient to support IIED claim, whereas an ongoing pattern of the same would); Shanley v. Hutchings, No. 2:22-cv-549-DBB-JCB, 716 F. Supp. 3d 1179, 1203 (D. Utah 2024) (same); Robertson v. Utah Fuel Co., 889 P.2d 1382, 1383–84 (Utah Ct. App. 1995) (dismissing IIED claim where plaintiff was required to meet individually with his co-workers to discuss their problems with his drug and alcohol use and was subsequently terminated); Tomlinson v. NCR Corp., 296 P.3d 760, 769 (Utah Ct. App. 2013) (finding employer's wrongful termination and false and defamatory statements to police about plaintiff employee were not "outrageous or intolerable conduct" sufficient to state an IIED claim), rev'd on other grounds, 345 P.3d 523.

Further, while courts typically reserve causation arguments for summary judgment, Mr. Overstreet's allegations notably fail to support a plausible inference that his emotional distress stems from his delayed break or reporting, as opposed to his being held at gunpoint.  Indeed, Mr. Overstreet alleges that he "has been attending therapy to deal with the trauma of this having a

gun pointed to his head while at work" (Compl. ¶ 36), but mentions no trauma as a result of his being asked to drive back to the UPS hub before taking a break.

### VI.    Motion for Extension

As a final matter, the court addresses UPS's argument that the court should not consider Mr. Overstreet's Opposition (ECF No. 17), which was filed roughly a month beyond the response deadline and unaccompanied by a motion for an extension.  (ECF No. 19 at 2–3 (citing DUCivR 7-1(f).)  Under Rule 6(b)(1), "the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect."  Fed. R. Civ. P. 6(b)(1).[18]  At the hearing on December 3, 2024, Mr. Overstreet formally moved for an extension and explained that his delay was excusable neglect as a result of his attorney's personal conflict. UPS conceded that it suffered no prejudice from the delay.  The court therefore finds good cause to grant an extension and entertain the points made in Mr. Overstreet's Opposition.

### ORDER

For these reasons, the court ORDERS as follows:

1.      The Defendant's Motion to Dismiss (ECF No. 10) is GRANTED.

2.      All the Plaintiff's claims are DISMISSED WITH PREJUDICE, except for the Plaintiff's reasonable accommodation claim, which is DISMISSED WITHOUT PREJUDICE.

3.      The court grants Plaintiff leave to file an amended complaint within 14 days from the date of this order.

DATED this 10th day of January, 2025.

---

[18] While the Federal Rules provide exceptions where the court lacks discretion to grant extensions, motions to dismiss do not qualify.  See Fed R. Civ. P. 6(b)(2); Lewis v. JPMorgan Chase Bank, Nat. Ass'n, 606 F. App'x 896, 898 n.3 (10th Cir. 2015).

BY THE COURT:

Tena Campbell
United States District Judge